Slip Op. 14-69

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| ———————————————— | : | |
| FOSHAN SHUNDE YONGJIAN | : | |
| HOUSEWARES & HARDWARE | : | |
| CO., LTD., and POLDER, INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | Before: Richard K. Eaton, Judge |
| | : | |
| Defendant, | : | Court No. 10-00059 |
| | : | |
| and | : | |
| | : | |
| HOME PRODUCTS INTERNATIONAL, | : | **PUBLIC VERSION** |
| LTD., | : | |
| | : | |
| Defendant-Intervenor. | : | |
| ———————————————— | : | |

OPINION and ORDER

[The Department of Commerce's determination is remanded.]

Dated: June 20, 2014

*William E. Perry*, Dorsey & Whitney LLP, of Seattle, WA, argued for plaintiffs. With him on the brief were *Emily Lawson* and *Derek A. Bishop*.

*Michael D. Snyder*, Trial Attorney, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for the defendant. With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *Rachael Wenthold Nimmo*, Senior Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington D.C.

*Frederick L. Ikenson,* Blank Rome LLP, of Washington D.C., argued for defendant-intervenor. With him on the brief was *Larry Hampel*.

EATON, Judge:  Before the court is the Department of Commerce's (the "Department" or "Commerce") Second Final Results of Redetermination Pursuant to Court Remand of the administrative review of the antidumping duty order on floor-standing metal top ironing tables and certain parts thereof from the People's Republic of China ("PRC").  Final Results of Redetermination Pursuant to Ct. Remand (ECF Dkt. No. 110) ("Second Remand Results").  On remand, Commerce was instructed to sufficiently corroborate the secondary information it relied on to assign Foshan Shunde Yongjian Housewares and Hardware Co., Ltd. ("Foshan Shunde" or, collectively with jointly represented plaintiff/importer Polder, Inc., "plaintiffs") a rate based on adverse inferences.[1]  To comply with the remand instructions, the Department was given the option to (a) supplement the record with additional information, or (b) further explain "why the Customs Data" it relied upon in the First Remand Results was substantial evidence corroborating the secondary information it relied upon when assigning the antidumping rate to plaintiff.  *Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*, 37 CIT __, __, Slip Op. 13-47, at 14 (2013) ("*Foshan Shunde II*"); Final Results of Redetermination Pursuant to Ct. Remand at 1, 3–5 (ECF Dkt. No. 71) ("First Remand Results").

STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (2006).  "The results of a redetermination pursuant to court remand are

---

[1]       The Department uses the shorthand phrase "AFA" when it draws an adverse inference as permitted by 19 U.S.C. § 1677e(c).

also reviewed for compliance with the court's remand order." *Xinjiamei Furniture (Zhangzhou)*

*Co. v. United States*, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (citation omitted) (internal

quotation marks omitted).


DISCUSSION

I.   Background

       This matter is before the court on plaintiffs' challenge to the Department's final results of

the fourth administrative review of the antidumping duty order on floor-standing metal-top ironing

tables and certain parts thereof from the PRC for the period of review ("POR") August 1, 2007

through July 31, 2008.  *See* Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof

from the PRC, 75 Fed. Reg. 3,201 (Dep't of Commerce Jan. 20, 2010), and the accompanying

Issues & Decision Memorandum (collectively, the "Final Results").  Because of inadequacies in

Foshan Shunde's questionnaire responses relating to production and sales information, in the Final

Results Commerce disregarded those submissions and, after applying facts otherwise available,

drew adverse inferences[2] as to the facts relating to Foshan Shunde's factors of production and sales

data.  Based on the same inadequacies, the Department also disregarded Foshan Shunde's

submissions regarding its independence from the PRC government, determining that Foshan

Shunde could not demonstrate an entitlement to separate-rate status and assigning plaintiff the

_____

       [2]       Where the Department has applied "facts otherwise available" under 19 U.S.C. §
1677e(a) to determine a rate and made an additional finding that the lack of useable evidence on
the record was the result of an interested party's failure to cooperate with the Department's request
for information to the best of its ability, the Department "may use an inference that is adverse to
the interests of that party in selecting from among the facts otherwise available."  19 U.S.C. §
1677e(b) (2006).

PRC-wide rate of 157.68 percent. *Foshan Shunde Yongjian Housewares & Hardware Co. v.*

*United States*, 35 CIT __, __, Slip Op. 11-123, at 4–5 (2011) ("*Foshan Shunde I*"). In *Foshan*

*Shunde I*, the court sustained Commerce's determination to draw adverse inferences as to the facts

relating to Foshan Shunde's factors of production and sales data, but remanded the case for the

Department to reexamine the facts surrounding its separate rate determination and the

antidumping duty rate applied to Foshan Shunde's merchandise. *Id.* at __, Slip Op. 11-123, at 40–

42.

In the First Remand Results, the Department determined that Foshan Shunde

"demonstrated entitlement to a separate rate," but that the record was devoid of any useful

information to calculate a rate because Foshan Shunde provided inadequate factors of production

and sales data. First Remand Results at 1. Relying on the finding in the Final Results, later

sustained by the court, that Foshan Shunde had failed to cooperate to the best of its ability with the

Department's requests for information, the Department, based on adverse inferences, assigned a

157.68 percent rate to Foshan Shunde. This rate was the calculated rate for a cooperating

respondent during the investigation.[3] First Remand Results at 1, 3–5, 7.

The Department argued the rate assigned to Foshan Shunde was supported by substantial

evidence and in accordance with law because (1) the rate was based upon secondary information

that was corroborated as required by 19 U.S.C. § 1677e(c), (2) the assigned rate was "an

individually calculated rate for a cooperative respondent in the investigation," (3) the rate "ha[d]

---

[3]    The period of investigation was from October 1, 2002 through March 31, 2003. In the final results of the investigation, rates of 9.47 percent, 72.29 percent, and 157.68 percent were calculated or assigned. *See Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof From the PRC*, 69 Fed. Reg. 47,868 (Dep't of Commerce Aug. 6, 2004) (notice of amended final determination of sales at less than fair value).

been used repeatedly as the rate assigned to the China-wide entity representing the rate for the

industry," and (4) data derived from imports of the subject merchandise into the United States

during the POR ("Customs Data") showed that some market participants were importing subject

merchandise while being subject to the 157.68 percent rate.  First Remand Results at 8, 9.

    In *Foshan Shunde II*, the court sustained the Department's determinations that Foshan

Shunde was entitled to a separate rate and to use adverse inferences to determine Foshan Shunde's

rate.  The court, however, further held that the Department had not sufficiently corroborated the

secondary information it used to assign the rate.  In particular, it held that the mere repeated

assignment, in other reviews, of a rate that was calculated during the investigation, could not be

used as corroboration for assigning the 157.68 percent rate to Foshan Shunde.  *Foshan Shunde II*,

37 CIT at __, Slip Op. 13-47, at 9 (citing 19 U.S.C. § 1677e(c); 19 C.F.R. § 351.308(d) (2008)).

    As to the claimed corroboration of the 157.68 percent rate by relying on evidence that some

importers had been subject to the rate during the POR, the court held that customs information was

an appropriate independent source to corroborate secondary information as a general matter.  *See*

19 U.S.C. § 1677e(c) ("When [the Department] relies on secondary information, . . . [it] shall, to

the extent practicable, corroborate that information from independent sources that are reasonably

at [its] disposal.").  The court further found, however, that the specific Customs Data relied upon

by the Department was lacking.  Specifically, the relevance of the relied upon data to plaintiff's

commercial reality was not supported by substantial evidence because, among other things,

nothing on the record expressly identified the entries listed in the Customs Data as being entries of

subject merchandise.  *Foshan Shunde II*, 37 CIT at __, Slip Op. 13-47, at 13.

*The Second Remand Results*

In the Second Remand Results, the Department again drew an adverse inference as to the facts relating to Foshan Shunde's rate and, using the investigation rate as secondary information, again assigned Foshan Shunde a 157.68 percent rate.  Second Remand Results at 1.  To corroborate the 157.68 percent rate, the Department again relied solely on the Customs Data as its independent source.  Second Remand Results at 1.  In so doing, the Department limited itself to the evidence present on the record prior to remand and concluded that the rate selected "is to the extent practicable corroborated by information from independent sources pursuant to 19 U.S.C. § 1677e(c)."  Second Remand Results at 1.

The Department observed that "the information from independent sources is limited to the Customs data," that "[n]o average unit value or price list data is on the record of this proceeding," and that it "has identified no other independent sources beyond these Customs data that could assist the Department in determining the probative value of the 157.68 percent AFA rate assigned to Foshan Shunde."  Second Remand Results at 5.

In its effort to comply with the court's instruction to provide additional explanation as to the relevance of the Customs Data to Foshan Shunde, Commerce makes several points.  First, the Department argues that the rate is relevant to Foshan Shunde because it had "already been calculated in a prior segment of the proceeding at the time Foshan Shunde took the risk of providing unusable data to the Department in this review."  Second Remand Results at 6.  That is, for Commerce, because "Foshan Shunde's actions demonstrate that it preferred to avoid providing to the Department the necessary information for calculating its true margin . . . Foshan Shunde knowingly chose to [accept the] risk" of receiving the selected rate and, thus, the selected "rate is relevant to Foshan Shunde by virtue of its choice not to cooperate."  Second Remand Results at 6.

"Thus, even before looking to the corroborative evidence, the 157.68 percent rate is relevant to

Foshan Shunde by virtue of its choice not to cooperate."  Second Remand Results at 6.

Second, the Department argues that the entries not only show that some market participants

had imported subject merchandise at the 157.68 percent rate during the POR, but that some of

those imports were of Foshan Shunde merchandise.  The Department insists that the Customs Data

represented subject merchandise because "the column 'AD_Rate'[4] specifically includes

shipments subject to antidumping duty liabilities.  [The Department] thus maintain[s] that the

portion of the entries for which Customs assessed an antidumping duty were subject to the

antidumping duty order, and of the tariff classification specific to ironing tables."  Second Remand

Results at 7.  In other words, the Department argues that although the Customs Data spreadsheet

does not contain language identifying the tariff heading of the entries it covers, the heading can be

inferred from the application of a 157.68 percent liquidation rate.  In addition, the Department

insists that, since some of the entries were Foshan Shunde's merchandise, these entries represented

some subject merchandise and are, thus, probative of Foshan Shunde's commercial reality.

Second Remand Results at 7–8.

The Department acknowledges that the entries of Foshan Shunde merchandise reflected in

the Customs Data were of "small quantities" and that those entries represented "both subject and

non-subject merchandise."  Second Remand Results at 7, 8.  However, Commerce argues that the

quantity of merchandise imported from other producers at the 157.68 percent rate "support[s] the

conclusion that exporters can, and have chosen to, participate in the U.S. market while being

---

        4        The "AD_RATE" or "antidumping rate" column is one of eleven columns in the
Customs Data.  The "AD_RATE" column contains the value [1.5768] for each entry.

assessed" that rate and, thus, the rate "reflects the commercial reality of Foshan Shunde."[5]  Second

Remand Results at 8–9, 9.  The Department also argues that the Customs Data is relevant to

Foshan Shunde because one entry of a large value was made by an alleged affiliate of Foshan

Shunde.  Second Remand Results at 9.  Taken as a whole, it is the Department's position that the

liquidation rate of these entries tends to prove that Foshan Shunde could, and did, do business in

subject merchandise during the POR while its products were subject to the 157.68 percent rate.

        In response to Foshan Shunde's comments during the remand proceedings, the Department

rejected arguments that it had failed to explain sufficiently why the Customs Data was relevant to

Foshan Shunde's commercial reality.  In particular, plaintiffs asserted that the Customs Data was

not relevant to Foshan Shunde because the Customs Data did not identify the tariff heading of the

imported merchandise or the names of the importers.  Moreover, the Department did not credit

plaintiffs' argument that, because the 157.68 percent rate was imposed on domestic importers at

liquidation and those importers were unaware of what their ultimate rate would be at the time they

imported the goods, the rate was not corroborated by the entries.  That is, for plaintiffs, because the

157.68 percent rate was imposed months after importation, the rate can not be said to represent any

importer's or exporter's commercial reality during the POR.  Second Remand Results at 9–11.

---

        [5]        It is worthwhile noting that, in accordance with case law, Commerce is
acknowledging here that it is not commercial reality in general that is important, but rather Foshan
Shunde's commercial reality.  *See Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701
F.3d 1367, 1371 (Fed. Cir. 2012) (Observing that "because nothing in the record . . . tied the AFA
rate . . . to [the respondent], we concluded that the AFA rate was unrelated to commercial reality
and not a reasonably accurate estimate of [the respondent's] actual dumping, hence, not supported
by substantial evidence.").

II.   Discussion

   *A.   The Corroboration Requirement of 19 U.S.C. § 1677e(c)*

       When Commerce relies on secondary information to assign a rate based on an adverse

inference it must, "to the extent practicable," corroborate that secondary information using

"information from independent sources that are reasonably at [its] disposal."  19 U.S.C. §

1677e(c).  In creating this requirement, Congress[6] expressly intended to check the Department's

ability to select potentially suspect secondary information when drawing adverse inferences.

Statement of Administrative Action Accompanying Uruguay Round Agreements Act, H.R. Doc.

No. 103-316 at 870, *reprinted* in 1994 U.S.C.C.A.N. 4040, 4199 (1994) ("SAA") ("Secondary

information may not be entirely reliable because, for example, as in the case of the petition, it is

based on unverified allegations, or as in the case of information from prior section 751(a) reviews,

it concerns a different time frame than the one at issue.").

       Thus, as explained in *Foshan Shunde II*, the statute requires that the assignment of a rate

resulting from an adverse inference based on secondary information be corroborated by evidence

showing that the rate is "reliable and relevant to the particular respondent."  *Foshan Shunde II*, 37

CIT at __, Slip Op. 13–47, at 9 (collecting cases); *Changzhou Wujin Fine Chem. Factory Co. v.

United States*, 701 F.3d 1367, 1371 n.2 (Fed. Cir. 2012) ("Commerce ha[s] interpreted

'corroborate' to mean that [Commerce] will, to the extent practicable, examine the reliability and

relevance of the information submitted." (citation omitted)); *Hubscher Ribbon Corp. v. United*

--------------------------------------------------------------------------------

       [6]       The corroboration requirement of 19 U.S.C. § 1677e(c) was added as part of the
Uruguay Round Agreements Act.  *See* Statement of Administrative Action Accompanying
Uruguay Round Agreements Act, H.R. Doc. No. 103-316 at 870, *reprinted* in 1994 U.S.C.C.A.N.
4040, 4198–99 (1994).

*States*, 38 CIT __, __, Slip Op. 14-43, at 8 (2014) ("In practice, 'corroboration' involves

confirming that the secondary information has 'probative value' by examining its 'reliability and

relevance.'" (citations omitted)); *Essar Steel Ltd. v. United States*, 37 CIT __, __, 908 F. Supp. 2d

1306, 1310 (2013); *Nan Ya Plastics Corp. v. United States*, 37 CIT __, __, 906 F. Supp. 2d 1348,

1351–52 (2013).

      To demonstrate the reliability and relevance of its selected secondary information, the

Department is required by the statute to locate "independent sources that are reasonably at [its]

disposal" that bear on the facts about which the Department is drawing the adverse inference.  19

U.S.C. § 1677e(c).  Commerce is then to compare the secondary information it is relying on to the

independent sources it has gathered to see if it has selected "secondary information that has some

grounding in [the] commercial reality" of the respondent during the POR.  *Gallant Ocean (Thai.)*

*Co. v. United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010).

      It is important to note that Congress placed the obligation to corroborate secondary

information using independent sources on the Department, not on the interested parties who are

normally responsible for generating the administrative record.  Indeed, the legislative history

demonstrates that Congress intended the Department to look beyond the record compiled by the

parties when corroborating secondary information.  For instance, the SAA's examples of

"independent sources" make this clear: "Independent sources may include, for example, published

price lists, official import statistics and customs data, *and* information obtained from interested

parties during the particular investigation or review."  SAA at 4199 (emphasis added).  The

"information obtained from interested parties during the particular investigation or review" is

precisely what constitutes the record as built by the parties.  The inclusion of other independent

sources as examples (published price lists and import statistics) is, then, demonstrative of

Congress' intent that the Department must go beyond the record built by the parties, to the extent

practicable, when seeking to corroborate its selected secondary information with independent

sources.

      The Department's regulations mirror this understanding of its duty when corroborating

secondary information.  There, again, examples of independent sources expressly include

information beyond that placed on the record by the parties: "Independent sources may include,

but are not limited to, published price lists, official import statistics and customs data, and

information obtained from interested parties during the instant investigation or review."  19 C.F.R.

§ 351.308(d) (2008).

      The upshot of Congress' direction is that the Department is not excused from its obligation

to corroborate secondary information used to draw an adverse inference simply because the

interested parties have placed no corroborative information on the record.  *See Washington Int'l*

*Ins. Co. v. United States*, 34 CIT __, __, Slip Op. 10-16, at 5 n.3 (2010) ("Nothing in the

antidumping statute indicates the measure or standard by which such secondary information must

be corroborated, but 'to the extent practicable' cuts a wide swath.  In this regard, at least it may be

opined that Congress intended Commerce to exert its utmost to remove doubt as to the reliability

of any secondary information it would rely upon.").  The Department has some leeway when the

parties have failed to put sufficient corroborative evidence on the record, but it still must make a

serious attempt to point to independent sources reasonably at its disposal that indicate the

relevance of the secondary material to the respondent.  *See, e.g.*, *Tianjin Mach. Imp. & Exp. Corp.*

*v. United States*, 36 CIT __, __, Slip. Op. 12-83, at 8–10 (2012) (finding secondary information

properly corroborated where the Department compared the selected information with the

plaintiff's sales data in the most recent review for which it had been given a calculated rate).  Put

another way, Commerce may not satisfy its obligation to corroborate simply by saying that the

record is empty of useful information and that corroboration is "not practicable" as a result.

### B.  The Department Has Failed to Demonstrate the Relevance of the Customs Data

In the Second Remand Results, the Department determined not to reopen the record to

obtain additional information "reasonably at [its] disposal" that would corroborate the

investigation rate, even though it did so when the case was remanded for the first time.  *See* First

Remand Results at 9 ("To further corroborate the rate, we have reviewed entry documentation and

U.S. Customs and Border Protection (CBP) liquidation data which support the conclusion that the

157.68 percent rate represents 'commercial reality.'  *See* CBP ACS Data available at Exhibit 1 of

the *Draft Redetermination Memorandum*.").  Rather, the Department continues to rely on the

Customs Data it placed on the record during the remand proceedings following *Foshan Shunde I*.

In *Foshan Shunde II*, the Department was instructed to explain the relevance of the Customs Data

to the commercial reality of Foshan Shunde.  Because the court found that the Department failed to

identify any record evidence indicating that the Customs Data represented entries of subject

merchandise, the Department was further directed to identify such record evidence or add such

evidence to the record.  *Foshan Shunde II*, 37 CIT at __, Slip Op. 13-47, at 14.  The Department

was permitted to reopen the record if additional evidence was required to comply with the court's

instruction.  Based on the existing record, however, Commerce's explanation as to why it has

sufficiently corroborated the assignment of the 157.68 percent rate is unconvincing.

First, the Department's assertion that the rate is automatically relevant as a result of Foshan

Shunde's failure to comply with the Department's requests for information to the best of its ability

during the review stretches a point.  Commerce has a long history of seeking to rely on

presumptions as substitutes for actual evidence.  Indeed, its argument in this case is little more than

a new attempt to satisfy the corroboration requirement with a modified form of the *Rhone Poulenc*

presumption.  *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990).  *Rhone*

*Poulenc* was a pre-Uruguay Round Agreements[7] case that permitted the Department to infer that

the highest prior margin of a particular respondent was the most probative evidence of that party's

rate when the respondent failed to answer the Department's questionnaires.  *Rhone Poulenc*, 899

F.2d at 1190 ("[I]t reflects a common sense inference that the highest prior margin is the most

probative evidence of current margins because, if it were not so, the importer, knowing of the rule,

would have produced *current* information showing the margin to be less.").

        This Court has previously rejected attempts to "dispense with [the] corroboration

requirement by employing the *Rhone Poulenc* presumption" and it does so again now.  *Tianjin*

*Mach. Imp. & Exp. Corp. v. United States*, 35 CIT __, __, 752 F. Supp. 2d 1336, 1348 (2011).

Indeed, the court has already rejected its application in this case.  *Foshan Shunde II*, 37 CIT at __,

Slip Op. 13–47, at 10 n.4 ("This is not a case where the *Rhone Poulenc* presumption that the

highest prior margin is probative applies.").  To the extent that the *Rhone Poulenc* presumption can

---

        [7]        That *Rhone Poulenc* was decided prior to the Uruguay Round Agreements is
important because that case "reflected the state of the law prior to the enactment of the Act that
implemented the Agreements' negotiated terms."  *Tianjin Mach. Imp. & Exp. Corp. v. United*
*States*, 35 CIT __, __, 752 F. Supp. 2d 1336, 1347 (2011) (citing *Gerber Food (Yunnan) Co. v.*
*United States*, 31 CIT 921, 947, 491 F. Supp. 2d 1326, 1351 (2007)).  As part of the Uruguay
Round Agreements Act, "Congress directed Commerce to make additional findings in AFA
cases."  *Id*. at __, 722 F. Supp. 2d at 1348 (citing 19 U.S.C. § 1677e(c)).  Among the additional
findings that Congress required of the Department was the corroboration of secondary information
used to make an adverse inference under 19 U.S.C. § 1677e(c).  Accordingly, the decision in
*Rhone Poulenc* "necessarily did not hold that the presumption could replace actual corroboration."
*Id*. at __, 722 F. Supp. 2d at 1348.

be used within the current statutory framework, the Federal Circuit has limited its applicability to

situations where (1) the rate used was calculated in a prior review segment for the party now

failing to cooperate, and (2) the party failing to cooperate did not respond to the Department's

questionnaires in any way.  *See KYD, Inc. v. United States*, 607 F.3d 760, 767 (Fed. Cir. 2010).

Neither of these situations is present in this case.  The 157.68 percent rate, that the

Department wishes to use here, was not calculated for Foshan Shunde and Foshan Shunde did, in

fact, respond to the Department's questionnaires, albeit in an unacceptable manner.  More

importantly, the presumption Commerce wishes to rely on here is not based on a "common sense

inference."  That is, in this review, plaintiff answered questionnaire inquires as to the amount of

each input by using a "weight based" methodology that the Department had found acceptable in

the first administrative review.  In this review, however, Commerce chose not to accept this

"weight based" methodology, but rather sought to probe more deeply into the amount of each input

used in the manufacture of the ironing tables.  The Department did this by issuing supplemental

questionnaires, each of which Foshan Shunde answered.  The court sustained the determination to

apply adverse inferences based on plaintiff's failure to cooperate to the best of its ability, because it

was not until Foshan Shunde answered the fourth supplemental questionnaire that it provided the

production notes that more clearly identified the amount of each input used to manufacture the

subject merchandise, and because plaintiff was slow to produce evidence of the kind of steel that it

used.

These facts, however, do not bear even a passing resemblance to those that led the Federal

Circuit to permit the use of the *Rhone Polenc* presumption in *KYD*.  There, the Federal Circuit

focused on the exporter's failure to cooperate entirely, submitting no information.  In addition, the

rate the *Rhone Polenc* presumption was used to corroborate in *KYD* was a rate assigned to the same

exporter in a prior segment of the review.  *KYD*, 607 F.3d at 767.  Here, Foshan Shunde submitted

record evidence of its inputs and the rate the Department seeks to support is not one that has

previously been assigned to Foshan Shunde.  Accordingly, this is not a case where a respondent

willfully chose not to comply with the Department's information requests knowing that had it

complied the result would have been a higher rate.  Therefore, no "common sense inference" can

be drawn and the Department can not satisfy its obligation to corroborate the 157.68 percent rate

on the basis of the presumption it wishes to use.

     Second, the Department's determination that the Customs Data represents subject

merchandise is not based on substantial evidence.  In order to demonstrate that subject

merchandise was imported at a 157.68 percent rate and, thus, that the rate is reflective of Foshan

Shunde's commercial reality, the Department relies on entries that were liquidated at a 157.68

percent antidumping duty rate and entered during the POR.  The Department, however, only points

to the liquidation rate of the entries, and that some entries were made by Foshan Shunde and a

Foshan Shunde affiliate, as evidence to corroborate the 157.68 percent rate.  Notably absent from

Commerce's analysis, however, is any direct evidence that the entries were classified under the

HTS heading for ironing tables, or any assertion that no other products imported during the POR

were liquidated at the 157.68 percent rate.  At its core, the Department's explanation is that

because certain products imported during the POR were liquidated at a rate of 157.68 percent,

those products were necessarily entries of subject merchandise.  Boot-strapping on this assertion,

the Department claims that, since some of the entries were the products of Foshan Shunde and a

claimed affiliate, as well as others, the entries represent Foshan Shunde's commercial reality with

respect to its subject ironing tables.  Thus, the Department is attempting to use the 157.68 percent

liquidation rate to demonstrate that the data represents entries of subject merchandise and then to

use that conclusion to show the relevance of the rate to plaintiff.  In other words, the only record

support of the relevance of the rates in the Customs Data are the rates themselves.

Had the Department pointed to some record evidence that no other type of merchandise,

imported during the POR, was liquidated at a rate of 157.68 percent, its conclusion that the entries

represented subject merchandise might be supported by substantial evidence.  Commerce,

however, cites no evidence to support this proposition.  *See* Second Remand Results at 7 ("The

Customs data consist of a summary spreadsheet that lists . . . the manufacturer (variable

MFRNAME), the antidumping duty liquidation rate (variable AD_Rate) and the quantity of

merchandise liquidated at the 157.68 percent rate (variable LIQ_AMT).  Regarding the tariff

classification of the entries that were liquidated at that rate, we note that the column 'AD_Rate'

specifically includes shipments subject to antidumping duty liabilities.  We thus maintain that the

portion of the entries for which Customs assessed an antidumping duty were subject to the

antidumping duty order, and of the tariff classification specific to ironing tables.").  This failure is

particularly striking because Commerce has been able to produce Customs information, which

includes the classification of the entered merchandise, in previous cases.  *See, e.g.*, *Since*

*Hardware (Guangzhou) Co. v. United States*, 37 CIT __, __, Slip Op. 13-71 at 13 n.5 (2013).

Similarly, if the record contained evidence that Foshan Shunde only exported subject

merchandise to the United States during the POR, then the conclusion that the entries of its

merchandise were entries of subject merchandise might be sufficiently supported.  The

Department, however, cites no record evidence that Foshan Shunde exported only subject

merchandise during the POR, and its analysis of the Customs Data indicates an awareness that

Foshan Shunde does, in fact, export non-subject merchandise.  *See* Second Remand Results at 7–

8.  Thus, there is no record evidence that only entries of subject merchandise were subjected to a

157.68 percent rate or that the importations of Foshan Shunde merchandise reflected in the

Customs Data were necessarily importations of subject merchandise.

Moreover, even if there were substantial evidence to support that the entries listed in the

Customs Data were entries of subject merchandise, the Customs Data would still fail to

demonstrate the relevance of the 157.68 percent rate to Foshan Shunde.  This is because the

Customs Data shows only the liquidation rates[8] of entries of allegedly subject merchandise

imported during the POR.  At the time of importation only the cash-deposit rates were known.  The

ultimate liquidation rate of merchandise subject to a review of an antidumping duty order is

unknown until after the completion of the review itself.  Thus, for Commerce to assert that Foshan

Shunde or other exporters "chose" to participate in the U.S. market knowing that its products were

subject to a 157.68 percent rate simply assumes too much.[9]  The Customs Data contains no

information as to the cash-deposit rates, which would have been the rate at which Foshan Shunde

or other exporters of subject merchandise would have voluntarily made sales.  Therefore, despite

---

[8]       The preliminary injunction entered in this case restrained the Department from liquidating subject merchandise "exported from the [PRC] to the United States by Foshan Shunde . . . and imported by Polder" during the POR.  Prelim. Inj. at 2 (ECF Dkt. No. 19).  Other entries of subject merchandise during the POR, which the Department argues are what the Customs Data reflects, were not suspended from liquidation and may have been liquidated at the 157.68 percent rate the Department applied in the Final Determination.  If the entries in the Customs Data are indeed of subject merchandise, their liquidation at the 157.68 percent rate is, thus, on account of the Final Determination.

[9]       An importer's willingness to purchase products ultimately subject to a particular antidumping duty rate is not particularly probative of a producer's or exporter's commercial reality.  Because of the retrospective nature of the United States' antidumping regime, what an importer may be willing to pay at the time of importation may not resemble what it is ultimately called upon to pay at liquidation.  In addition, factors such as existing contractual obligations, test sales for new importers, or other commercial considerations may divorce an importer's decision to purchase from the cash-deposit rate it initially pays.

the Department's arguments to the contrary, the Customs Data sheds no light on whether

"exporters can, and have chosen to, participate in the U.S. market while being assessed

antidumping duties of 157.68 percent." Second Remand Results at 8–9. That is, there is no

evidence Foshan Shunde sold subject merchandise into the United States knowing that the

liquidation rate would ultimately be determined to be 157.68 percent. Foshan Shunde's

commercial reality is thus not demonstrated by this set of facts.


C.      *Commerce Has Not Adequately Explained Why Corroboration Is Not Practicable*

In the Second Remand results, the Department asserts that it "has identified no other

independent sources beyond these Customs data that could assist the Department in determining

the probative value of the 157.68 percent AFA rate assigned to Foshan Shunde." Second Remand

Results at 5. The Department, however, makes no mention of what other independent sources it

attempted to identify. Considering the Department's past practice, it seems unlikely that no other

independent sources were available to it for the purposes of corroboration. For instance, as has

been noted, the Department has acquired Customs importation information that identifies both the

tariff heading of the imported merchandise and the rate of antidumping duty imposed in other

cases. *See, e.g.*, *Since Hardware*, 37 CIT at __, Slip Op. 13-71 at 13 n.5. Moreover, the SAA and

Commerce's regulations themselves identify "published price lists" and "official import statistics"

as examples of independent sources that the Department could consult to corroborate secondary

information. SAA at 4199.

Where the Department states that it has been unable to identify independent sources to

corroborate its selected secondary information, without more, the reasonable conclusion to be

drawn under the statute is not that corroborating its selected secondary information is "not

practicable."  Rather, the reasonable conclusion is that Commerce's selected secondary

information is not probative and that the Department should rethink its selection of that secondary

information.  *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1380

(Fed. Cir. 2013) ("[T]his court finds no support in this court's precedents or the statute's plain text

for the proposition that limited resources . . . can override fairness or accuracy. . . .  '[I]f the record

before the agency does not support the agency action . . . the proper course, except in rare

circumstances, is to remand to the agency for additional investigation or explanation.'" (citations

omitted)); *Gallant Ocean*, 602 F.3d at 324–25 (remanding the Department's determination where

it failed to corroborate its selected secondary information and other "reliable information

suggest[ed] the application of a much lower margin.").

      The "to the extent practicable" limitation on the duty to corroborate was intended to permit

the Department to rely on relevant independent sources whose data is "reasonably at [its]

disposal."  19 U.S.C. § 1677e(c).  The statute and this Court do not require the Department to go to

extraordinary lengths to corroborate secondary information where the record is deficient.  *See,*

*e.g.*, *PSC VSMPO-AVISMA Corp. v. United States*, 35 CIT __, __, Slip Op. 11-115, at 5 (2011)

(using Global Trade Atlas data); *Hubscher Ribbon*, 38 CIT at __, Slip Op. 14-43, at 14–16 (using

petition data); *Nan Ya Plastics*, 38 CIT at __, 906 F. Supp. 2d at 1351–53 (using data from prior

segments of the review and collecting cases); *Tianjin Mach.*, 36 CIT at __, Slip Op. 12-83, at 10–

13 (using data from prior segments of the review).  Nonetheless, the Department is not permitted to

rely solely on a claimed absence of corroborating independent information to support its

conclusions without an explanation.  Rather, the Department must still seek relevant independent

sources to corroborate its secondary information, and if it cannot locate such information, it must

describe the steps that it has taken so that a reviewing Court can determine if the Department's

finding that corroboration was not practicable is supported by substantial evidence and in

accordance with law.  *See Toyota Motor Sales, U.S.A., Inc. v. United States*, 22 CIT 643, 651, 15 F.

Supp. 2d 872, 877–79 (1998) ("For purposes of judicial review, the evidence before this Court is

limited to the evidence contained in the administrative record.  The Court is not to substitute its

own determination for the agency's but rather is to determine whether Commerce's determination

is supported by substantial evidence on the record and is otherwise in accordance with law."

(citations omitted)).

Accordingly, if on remand the Department continues to maintain that there are no other

independent sources reasonably at its disposal which are relevant to the probative value of its

selected secondary information, it shall explain what steps it took to locate relevant independent

sources and why those steps bore no fruit.

CONCLUSION AND ORDER

For the foregoing reasons, it is hereby

ORDERED that the Second Remand Results are REMANDED; it is further

ORDERED that, on remand, Commerce shall issue a redetermination that complies in all

respects with this Opinion and Order, is based on determinations that are supported by substantial

record evidence, and is in all respects in accordance with law; it is further

ORDERED that should the Department continue to assign Foshan Shunde the 157.68

percent rate, the Department shall open the record and make all reasonably practicable efforts to

identify independent sources reasonably at its disposal that bear on the relevance of the 157.68

percent rate to Foshan Shunde; it is further

Court No. 10-00059                                                                   Page 21

ORDERED that should the Department be unable to identify any independent sources that

bear on the relevance of the 157.68 percent rate, it will explain what independent sources it

considered and why those sources contained no relevant information; it is further

ORDERED that should the Department decline to continue to assign the 157.68 percent

rate, it shall determine a separate rate for Foshan Shunde that is supported by substantial evidence

and in accordance with law; and it is further

ORDERED that the remand results shall be due on September 13, 2014; comments to the

remand results shall be due thirty (30) days following filing of the remand results; and replies to

such comments shall be due fifteen (15) days following filing of the comments.

Dated:        June 20, 2014
              New York, New York


                                                          /s/ Richard K. Eaton
                                                          Richard K. Eaton