Slip Op. 16-35

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                    :
FOSHAN SHUNDE YONGJIAN              :
HOUSEWARES & HARDWARE               :
CO., LTD., and POLDER, INC.,        :
                                    :
        Plaintiffs,                 :
                                    :
        v.                          :
                                    :            Before: Richard K. Eaton, Judge
UNITED STATES,                      :
                                    :            Court No. 10-00059
        Defendant,                  :
                                    :
        and                         :
                                    :
HOME PRODUCTS INTERNATIONAL,        :
INC.,                               :
                                    :
        Defendant-Intervenor.       :
_____:
```

## OPINION

[The United States Department of Commerce's Final Results of Redetermination are sustained.]

Dated: April 7, 2016

*William E. Perry*, Dorsey & Whitney LLP, of Seattle, WA, argued for plaintiffs. With him on the brief was *Emily Lawson*.

*Michael D. Snyder*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant. With him on the brief were *Joyce R. Branda*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *Aman Kakar*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, of Washington, DC.

*Frederick L. Ikenson*, Blank Rome LLP, of Washington, DC, argued for defendant-intervenor. With him on the brief was *Larry Hampel*.

EATON, Judge: Before the court is the United States Department of Commerce's ("Commerce" or "the Department") Third Final Results of Redetermination Pursuant to Court Remand pertaining to the fourth administrative review of the antidumping duty order covering floor-standing metal-top ironing tables and certain parts thereof from the People's Republic of China ("PRC"). *See Final Results of Redetermination Pursuant to Ct. Remand* (Dep't of Commerce Oct. 10, 2014) (ECF Dkt. No. 143) ("Third Remand Results"). On this third remand, Commerce was directed to either (1) properly corroborate[1] the secondary information it relied upon in assigning plaintiff Foshan Shunde Yongjian Housewares and Hardware Co., Ltd. ("Foshan Shunde" or "plaintiff"), and its importer of record, Polder, Inc., an antidumping duty rate of 157.68 percent based on adverse facts available ("AFA"), or (2) determine a new rate for plaintiff that is supported by substantial evidence and is in accordance with law. *See Foshan Shunde Yongjian Housewares & Hardware Co. v. United States* (*Foshan Shunde III*), 38 CIT __,

---

[1]         During the pendency of this case, the Trade Preferences Extension Act of 2015 was signed into law, which, among other things, amends the corroboration requirement under 19 U.S.C § 1677e. *See* Pub. L. No. 114-27, 129 Stat. 362 (2015). Specifically, § 502 of the Act modifies the provisions pertaining to the selection and corroboration of AFA rates. As is relevant here, the revised corroboration requirement under § 1677e(c) now contains an exception under which Commerce is not "required to corroborate any dumping margin . . . applied in a separate segment of the same proceeding." 19 U.S.C § 1677e(c)(2) (2015). In addition, the Act provides that when Commerce uses AFA, it "may . . . use any dumping margin from any segment of the proceeding under the applicable antidumping order . . . including the highest such rate or margin." *Id.* § 1677e(d)(1)–(2). Further, for purposes of corroborating an AFA rate, Commerce is no longer required "to estimate what the . . . dumping margin would have been if the interested party found to have failed to cooperate . . . had cooperated," or "to demonstrate that the . . . dumping margin used by [Commerce] reflects an alleged commercial reality of the interested party." *Id.* § 1677e(d)(3). As the Federal Circuit recently noted, however, "the amendments do not apply to final determinations that Commerce made prior to the date of enactment." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337 n.2 (Fed. Cir. 2016) (citing *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348–52 (Fed. Cir. 2015)); *see also Fresh Garlic Producers Ass'n v. United States*, 39 CIT __, __, Slip Op. 15-133, at 31 (Nov. 30, 2015) ("To apply § 502 on remand would be in effect to apply the law retroactively by applying it to a determination that occurred before the new law became effective.").

__, 991 F. Supp. 2d 1322, 1334–35 (2014).  In the Third Remand Results, because Commerce determined it was unable to identify additional information to corroborate the previously-assigned rate, it assigned, under protest, a duty rate of 72.29 percent to Foshan Shunde, which was the rate assigned to the separate-rate companies in the underlying less-than-fair-value investigation ("the Investigation").  Third Remand Results at 2.

Plaintiff and defendant-intervenor, Home Products International, Inc. ("HPI" or "defendant-intervenor"), object to the 72.29 percent duty rate.  Foshan Shunde argues the Department failed to corroborate the new rate and that it does not reflect the company's commercial reality.  Comments on Third Remand Results 7–9 (ECF Dkt. No. 151) ("Pl.'s Cmts.").  HPI, on the other hand, insists the 157.68 percent duty rate previously assigned to Foshan Shunde was corroborated to the extent practicable, and that the new rate is inconsistent with the court's remand order, unsupported by substantial evidence, and not in accordance with law.  *See* Comments of HPI on the Third Remand Results 2 (ECF Dkt. No. 147) ("Def.-Int.'s Cmts.").  For the reasons set forth below, Commerce's Third Remand Results are sustained.


## BACKGROUND

I.    THE FINAL RESULTS

In 2004, Commerce issued an antidumping duty order covering floor-standing metal-top ironing tables and certain parts thereof from the PRC ("subject merchandise").  *See Floor-Standing, Metal-Top Ironing Tables & Certain Parts Thereof From the PRC*, 69 Fed. Reg. 35,296 (Dep't of Commerce June 24, 2004) (notice of final determination of sales at less than fair value); *Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof From the PRC*, 69 Fed. Reg. 47,868 (Dep't of Commerce Aug. 6, 2004) (notice of amended final determination of sales at less than fair value and antidumping duty order) (collectively, "the Order").  The final

results of the fourth administrative review of the Order, covering the period of review ("POR")

August 1, 2007 through July 31, 2008, were issued on January 20, 2010.  *See Floor-Standing,*

*Metal-Top Ironing Tables and Certain Parts Thereof From the PRC*, 75 Fed. Reg. 3,201 (Dep't

of Commerce Jan. 20, 2010) (final results of antidumping duty administrative review), and the

accompanying Issues & Decision Memorandum (collectively, the "Final Results").

In the Final Results, Commerce identified certain deficiencies in Foshan Shunde's

questionnaire responses related to the company's factors of production and sales information,

and therefore disregarded those submissions.  In light of these inadequacies, the Department

applied AFA when selecting from among the available facts,[2] and thus drew inferences adverse

to Foshan Shunde as to its reported factors of production and sales data.  In addition, Commerce

used these deficiencies as a basis to disregard the information Foshan Shunde offered to

demonstrate its independence from the PRC government.[3]  Accordingly, Commerce determined

Foshan Shunde was not entitled to a separate rate, and therefore assigned the PRC-wide rate of

---

[2]        "If Commerce finds that a respondent has 'failed to cooperate by not acting to the best of its ability to comply with a request for information,' the statute permits the agency to draw adverse inferences commonly known as 'adverse facts available' when selecting from among the available facts."  *Nan Ya Plastics*, 810 F.3d at 1338 (quoting 19 U.S.C. § 1677e(b) (2006)).

[3]        In reviews involving merchandise from a non-market economy country, such as the PRC, Commerce presumes all respondents are government-controlled, and therefore subject to a single country-wide duty rate.  *Ad Hoc Shrimp*, 802 F.3d at 1353.  "Respondents may rebut this presumption and become eligible for a separate rate by establishing the absence of both de jure and de facto government control.  If a respondent fails to establish its independence, Commerce relies upon the presumption of government control and applies the country-wide rate to that respondent."  *Id.* (citation omitted).

157.68 percent[4] to the company.  *See Foshan Shunde Yongjian Housewares & Hardware Co. v. United States* (*Foshan Shunde I*), 35 CIT __, __, Slip Op. 11-123, at 4–5 (Oct. 12, 2011).

In *Foshan Shunde I*, the court sustained Commerce's determination to apply AFA as to Foshan Shunde's factors of production and sales data, but remanded the case for the Department to reexamine the facts surrounding the company's separate-rate status and the duty rate applied to the company.  *Id.* at __, Slip Op. 11-123, at 40–42.

## II.   THE FIRST REMAND RESULTS

In its First Results of Redetermination Pursuant to Court Order ("First Remand Results"), the Department determined that Foshan Shunde was entitled to a separate rate, but it could not determine such a rate because the record did not contain reliable information regarding plaintiff's factors of production and sales data.  *See* First Remand Results at 1 (Dep't of Commerce June 11, 2012) (ECF Dkt. No. 71).  Relying on its finding in the Final Results that Foshan Shunde failed to cooperate to the best of its ability with the Department's requests for information, as affirmed by the court in *Foshan Shunde I*, Commerce again assigned the rate of 157.68 percent based on AFA.  *Id.* at 1, 3–7.  The Department asserted this determination was supported by substantial evidence and in accordance with law because: (1) it was based upon secondary information that was corroborated; (2) the assigned rate was "an individually calculated rate for a cooperative respondent in the investigation"; (3) the rate "ha[d] been used repeatedly as the rate assigned to the [PRC]-wide entity representing the rate for the industry"; and (4) data from the United States Customs and Border Protection Agency ("Customs") included imports of subject

---

[4]      The 157.68 percent duty rate was the highest rate selected for a cooperating respondent during the Investigation.  The other rates assigned during the Investigation were 9.47 percent and 72.29 percent.  *Foshan Shunde III*, 38 CIT at __, __ n.3, 991 F. Supp. 2d at 1325, 1325 n.3.

merchandise into the United States during the POR (the "Customs Data") made by market participants who were subject to the 157.68 percent duty rate. *Id.* at 8–9.

In *Foshan Shunde II*, the court sustained both the Department's determination that Foshan Shunde was entitled to a separate rate, as well as its use of AFA in selecting that rate. *See Foshan Shunde Yongjian Housewares & Hardware Co. v. United States* (*Foshan Shunde II*), 37 CIT __, Slip Op. 13-47 (Apr. 8, 2013). The court held, however, that Commerce had not sufficiently corroborated the secondary information it used to assign the duty rate. *Id.* Specifically, the court found that simply repeating the assignment of a duty rate, calculated during an underlying investigation, does not constitute adequate corroboration for assigning that rate as AFA to a specific respondent in subsequent reviews. *Id.* at __, Slip Op. 13-47, at 9 (citing 19 U.S.C. § 1677e(c) (2006); 19 C.F.R. § 351.308(d) (2008)).

As to the Department's claim that the 157.68 percent duty rate was corroborated because other importers had made entries while subject to this rate during the POR, the court stated that, in general, information from Customs is an appropriate independent source to corroborate secondary information. *Id.* at __, Slip Op. 13-47, at 11. The court further found, however, that the specific Customs Data relied upon by the Department in this case was lacking. *Id.* at __, Slip Op. 13-47, at 11–13. Specifically, the court found the claimed relevance of the Customs Data to Foshan Shunde's commercial reality was not supported by substantial evidence because, among other things, nothing on the record expressly identified the entries in the Customs Data as entries of subject merchandise. *Id.* at __, Slip Op. 13-47, at 12–13. Accordingly, the court instructed Commerce on remand to supplement the record with additional information or to further explain why the Customs Data constituted substantial evidence that corroborated the secondary information it relied upon in assigning Foshan Shunde's AFA rate. *Id.* at _, Slip Op. 13-47, at 14.

### III.   THE SECOND REMAND RESULTS

In the Second Final Results of Redetermination Pursuant to Court Remand ("Second

Remand Results"), the Department again applied AFA in assigning Foshan Shunde a duty rate of

157.68 percent, continuing to use the Investigation rate as secondary information.  Second

Remand Results at 1 (Dep't of Commerce July 8, 2013) (ECF Dkt. No. 111).  To corroborate the

rate, the Department again relied solely on the Customs Data as its independent source.  *Id.* at 6–

8.  In doing so, Commerce limited itself to the record evidence and concluded the selected rate

was "to the extent practicable corroborated by information from independent sources pursuant to

19 U.S.C. § 1677e(c)."  *Id.* at 1.  In particular, the Department stated that the available

"information from independent sources is limited to the Customs data"; that "[n]o average unit

value or price list data is on the record of this proceeding"; and that it "has identified no other

independent sources beyond these Customs data that could assist the Department in determining

the probative value of the 157.68 percent AFA rate assigned to Foshan Shunde."  *Id.* at 5.

As to the court's instruction to explain the relevance of the Customs Data to Foshan

Shunde, Commerce asserted: (1) the rate is relevant to Foshan Shunde because it "had already

been calculated in a prior segment of the proceeding at the time Foshan Shunde took the risk of

providing unusable data to the Department in this review," *id.* at 6 ("Foshan Shunde's actions

demonstrate that it preferred to avoid providing to the Department the necessary information for

calculating its true margin. . . .  Foshan Shunde knowingly chose to [accept the] risk" of

receiving the selected rate and, thus, the selected "rate is relevant to Foshan Shunde by virtue of

its choice not to cooperate."); and (2) the entries in the Customs Data show that some market

participants had imported subject merchandise at the 157.68 percent rate, including one entry of

a large value by an alleged affiliate of Foshan Shunde.  *Id.* at 7–9; *see also Foshan Shunde III*, 38

CIT at __, 991 F. Supp. 2d at 1327 ("Taken as a whole, it is the Department's position that the

liquidation rate of these entries tends to prove that Foshan Shunde could, and did, do business in subject merchandise during the POR while its products were subject to the 157.68 percent rate.").

In *Foshan Shunde III*, the court held that the Department again failed to demonstrate the relevance of the Customs Data to Foshan Shunde, and did not adequately explain why corroboration was not practicable in this case. *Id.* at __, 991 F. Supp. 2d at 1329–34. The court noted that Commerce chose not to reopen the record to obtain additional information to corroborate the 157.68 percent duty rate, but, rather, continued to rely on the Customs Data alone. *Id.* at __, 991 F. Supp. 2d at 1329–30. The court therefore concluded, "[b]ased on the existing record, . . . Commerce's explanation as to why it has sufficiently corroborated the assignment of the 157.68 percent rate is unconvincing." *Id.* at __, 991 F. Supp. 2d at 1330.

First, the court found "the Department's assertion that the rate is automatically relevant as a result of Foshan Shunde's failure to comply with the Department's request for information" to be "little more than a new attempt to satisfy the corroboration requirement with a modified form of the *Rhone Poulenc* presumption."[5] *Id.* at __, 991 F. Supp. 2d at 1330 (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990)). The court explained that *Rhone Poulenc*, a pre-Uruguay Round Agreements[6] case, permitted Commerce "to infer that the highest prior

_____

[5]      The court further noted that "this Court has previously rejected attempts to 'dispense with [the] corroboration requirement by employing the *Rhone Poulenc* presumption' and it does so again now." *Foshan Shunde III*, 38 CIT at __, 991 F. Supp. 2d at 1330 (quoting *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 35 CIT __, __, 752 F. Supp. 2d 1336, 1348 (2011)). In any case, the court had already rejected the application of the *Rhone Poulenc* presumption in *Foshan Shunde II*. *See Foshan Shunde II*, 37 CIT at __ n.4, Slip Op. 13-47, at 10 n.4 ("This is not a case where the *Rhone Poulenc* presumption that the highest prior margin is probative applies.").

[6]      As explained in *Foshan Shunde III*, because *Rhone Poulenc* was decided prior to the Uruguay Round Agreements, "it reflect[s] the state of the law prior to the enactment of the

(footnote continued)

margin of a particular respondent was the most probative evidence of that party's rate when the

respondent failed to answer the Department's questionnaires." *Id.* (citing *Rhone Poulenc*, 899

F.2d at 1190 ("[I]t reflects a common sense inference that the highest prior margin is the most

probative evidence of *current* margins because, if it were not so, the importer, knowing of the

rule, would have produced current information showing the margin to be less.")).  The court

explained that the application of this presumption within the current statutory framework is

limited "to situations where (1) the rate used was calculated in a prior review segment for the

party now failing to cooperate, and (2) the party failing to cooperate did not respond to the

Department's questionnaires in any way," neither of which occurred in this case.  *Id.* at __, 991

F. Supp. 2d at 1331.

Second, the court found Commerce's determination that the Customs Data represented

subject merchandise was not supported by substantial evidence.  *Id.* at __, 991 F. Supp. 2d at

1331–32 ("The Department . . . only points to the liquidation rate of the entries, and that some

entries were made by Foshan Shunde and a Foshan Shunde affiliate, as evidence to corroborate

the 157.68 percent rate.  Notably absent from Commerce's analysis, however, is any direct

evidence that the entries were classified under the [tariff] heading for ironing tables, or any

assertion that no other products imported during the POR [(i.e., products other than subject

merchandise)] were liquidated at the 157.68 percent rate.").  In other words, the court rejected

the Department's attempt to use the 157.68 percent rate to show the Customs Data represents

entries of subject merchandise, and is therefore relevant to Foshan Shunde, observing "the only

---

Act that implemented the Agreements' negotiated terms." *Tianjin Mach.*, 35 CIT at __, 752 F.
Supp. 2d at 1347.  Specifically, part of the Uruguay Round Agreements Act requires "Commerce
to make additional findings in AFA cases," such as corroborating secondary information used for
AFA rates under 19 U.S.C. § 1677e(c).  *Id.* at __, 752 F. Supp. 2d at 1348.  Thus, *Rhone Poulenc*
"necessarily did not hold that the presumption could replace actual corroboration." *Id.*

record support of the relevance of the rates in the Customs Data are the rates themselves." *Id.* at

__, 991 F. Supp. 2d at 1332.  That is, just because the Customs Data may have included entries

made by Foshan Shunde, such entries were not necessarily of subject merchandise.  In addition,

liquidation rates, which are unknown to importers at the time of entry, do not reveal much about

the relevance of a particular AFA rate to a specific respondent.  *See id.* at __, 991 F. Supp. 2d at

1328 (agreeing "that, because the 157.68 percent rate was imposed on domestic importers at

liquidation and those importers were unaware of what their ultimate rate would be at the time

they imported the goods, the rate was not corroborated by the [liquidation rates].  That is, for

[Foshan Shunde], because the 157.68 percent rate was imposed months after importation, the rate

can not be said to represent any importer's or exporter's commercial reality during the POR").

     As to the practicability of corroborating the selected AFA rate, the court found the

Department made "no mention of what other independent sources it attempted to identify" in

support of its conclusion that corroboration was impracticable in this case.  *Id.* at __, 991 F.

Supp. 2d at 1333.  Indeed, the court stated:

> Where the Department states that it has been unable to identify independent
> sources to corroborate its selected secondary information, without more, the
> reasonable conclusion to be drawn under the statute is not that corroborating its
> selected secondary information is "not practicable."   Rather, the reasonable
> conclusion is that Commerce's selected secondary information is not probative
> and that the Department should rethink its selection of that secondary information.

*Id.* at __, 991 F. Supp. 2d at 1333–34.  The court also clarified that it is Commerce's

responsibility to locate independent sources to corroborate secondary information used in

selecting AFA rates: "Congress placed the obligation to corroborate secondary information using

independent sources on the Department, not on the interested parties who are normally

responsible for generating the administrative record."  *Id.* at __, 991 F. Supp. 2d at 1329.

The court further noted the statute's "to the extent practicable" limitation "was intended to permit the Department to rely on relevant independent sources whose data is 'reasonably at [its] disposal,'" and neither the statute nor this Court require "the Department to go to extraordinary lengths to corroborate secondary information where the record is deficient." *Id.* at __, 991 F. Supp. 2d at 1334 (quoting 19 U.S.C. § 1677e(c)).  Here, however, the court did not allow the Department "to rely solely on a claimed absence of corroborating independent information to support its conclusions without an explanation," but required Commerce to "seek relevant independent sources to corroborate its secondary information, and if it [could not] locate such information, . . . describe the steps that it has taken so that a reviewing Court can determine if the Department's finding that corroboration was not practicable is supported by substantial evidence and in accordance with law." *Id.* at __, 991 F. Supp. 2d at 1334.

In sum, five holdings can be found in the remands in this case: (1) "the decision in *Rhone Poulenc* 'necessarily did not hold that the presumption could replace actual corroboration,'" and the presumption's use is limited to situations where the rate "was calculated in a prior review segment for the party now failing to cooperate" and the uncooperative party failed to respond to the Department's questionnaires altogether, *id.* at __ n.7, __, 991 F. Supp. 2d at 1330 n.7, 1331; (2) evidence that a respondent's merchandise was liquidated at a particular rate is not probative of its commercial reality unless it can be shown that the entries were of subject merchandise, *see id.* at __, 991 F. Supp. 2d at 1331–32; (3) because at the time of importation importers are unaware of what their ultimate liquidation rates will be, liquidation rates are not probative of an importer's commercial reality during the POR, *see id.* at __, 991 F. Supp. 2d at 1328; (4) it is Commerce's "obligation to corroborate secondary information using independent sources" and build the record for that purpose, "not . . . the interested parties who are normally responsible for generating the administrative record," *id.* at __, 991 F. Supp. 2d at 1329; and (5) the Department

may not simply rely on a claimed absence of independent information to support its conclusion

that corroboration is impracticable: "Rather, the Department must still seek relevant independent

sources to corroborate its secondary information, and if it cannot locate such information, it must

*describe the steps* that it has taken so that a reviewing Court can determine if the Department's

finding that corroboration was not practicable is supported by substantial evidence and in

accordance with law," *id.* at __, 991 F. Supp. 2d at 1334 (emphasis added).

Accordingly, the court again remanded the case, instructing Commerce, if it continued to

assign the 157.68 percent rate, to reopen "the record and make all reasonably practicable efforts

to identify independent sources reasonably at its disposal that bear on the relevance of the 157.68

percent rate to Foshan Shunde" or, if it was unable to do so, to "explain what independent

sources it considered and why those sources contained no relevant information." *Id.* at __, 991

F. Supp. 2d at 1334–35.  In addition, if Commerce declined to assign the 157.68 percent rate, the

court ordered the Department to "determine a separate rate for Foshan Shunde that is supported

by substantial evidence and in accordance with law." *Id.* at __, 991 F. Supp. 2d at 1335.


IV.     **THE THIRD REMAND RESULTS**

In the Third Remand Results, now before the court, the Department stated it "found no

additional information to potentially corroborate an AFA rate for Foshan Shunde beyond the

Customs [D]ata that were examined in the [First and Second Remand Results]."  Third Remand

Results at 2.  Specifically, in an attempt to corroborate the 157.68 percent rate, "the Department

opened the record, searched for independent sources that would bear on the relevance of 157.68

percent rate, but found no additional statistical data from an independent source that may

represent Foshan Shunde's 'commercial reality,' or that would otherwise bear on the relevance

of the 157.68 percent rate." *Id.* at 7, 7 n.36 (The Department "searched the internet in an attempt

to find any 'primary information' that is contemporaneous with the [POR] and could address the

commercial reality concerns identified by the Court.  [It] found no relevant information.  [It] also

re-examined the record to determine whether any additional Customs data had been overlooked.

None was.  [It] also considered whether any additional Customs data might be useful, but could

not identify any additional Customs data or sources reasonably at the Department's disposal.").

In addition, Commerce noted that "information concerning Foshan Shunde's U.S. sales and

factors of production data is unavailable.  Thus, given Foshan Shunde's failure to provide usable

U.S. sales and factors of production data, the Department cannot determine a 'commercial

reality' specific to Foshan Shunde."  *Id.* at 6.  Thus, Commerce assigned, under protest, a revised

AFA rate of 72.29 percent, which is the weighted average of the rates calculated for the two

mandatory respondents in the Investigation (i.e., 157.68 percent and 9.47 percent).  *Id.* at 2, 10.

As to its selection of the 72.29 percent rate, the Department "looked to other rates that

may be considered for use as AFA," but found "other rates calculated in the history of this

proceeding . . . would similarly fail to qualify as a potential source for AFA given the criteria set

forth by the Court in *Foshan Shunde III*."  *Id.* at 8.  In particular, Commerce asserts:

> The only calculated, non-AFA rate specific to Foshan Shunde is the 2.37 percent
> rate determined for Foshan Shunde in the 2004–2005 review of this order.  All of
> the other potential AFA rates . . . were either 1) calculated for companies other
> than Foshan Shunde, 2) are from the [underlying] investigation or otherwise pre-
> date the [POR] (and, thus, given the analysis set forth in *Foshan Shunde II* and
> *Foshan Shunde III*, therefore, not specifically 'relevant' to Foshan Shunde, or 3)
> are rates that are too low to induce cooperation in future reviews of this
> proceeding and are therefore unsuitable for use as an AFA rate.

*Id.* at 8–9 (footnote omitted).  Furthermore, according to Commerce, "[a]s a rate that is culled

from the history of two respondents, the 72.29 percent AFA rate is broader in scope than is a

single rate," and "is the current rate in effect for all companies which have demonstrated they are

separate from the PRC-wide entity."  *Id.* at 10.  For these reasons, Commerce concluded, the

"72.29 percent rate better addresses the Court's expressed concerns regarding 'relevance' and

'commercial reality' compared to a single rate that was calculated for one company."  *Id.*

Finally, "[u]nlike lower rates that range from zero to 10.18 percent, in selecting from among the

facts available [Commerce found] that 72.29 percent represents a rate that is sufficient to induce

future cooperation and ensures that Foshan Shunde does not obtain a more favorable result by

failing to cooperate than if it had cooperated fully."  *Id.*


### STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19

U.S.C. § 1516a(b)(1)(B)(i).  "'The results of a redetermination pursuant to court remand are also

reviewed for compliance with the court's remand order.'"  *Yantai Xinke Steel Structure Co. v.*

*United States*, 38 CIT __, __, Slip Op. 14-38, at 4 (Apr. 9, 2014) (quoting *Xinjiamei Furniture*

*(Zhangzhou) Co. v. United States*, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014)).


### DISCUSSION

**I.   LEGAL FRAMEWORK**

During administrative reviews, Commerce requests information from respondents and if

a respondent "withholds information that has been requested by [Commerce]," "fails to provide

such information by the deadlines . . . or in the form and manner requested," "significantly

impedes a proceeding," or "provides such information but the information cannot be verified,"

Commerce is permitted to "use the facts otherwise available" in making its determinations.  19

U.S.C. § 1677e(a)(2)(A)–(D).  If Commerce further finds a respondent has "failed to cooperate

by not acting to the best of its ability to comply with a request for information," then it "may use

an inference that is adverse to the interests of that party in selecting from among the facts

otherwise available" (i.e., it may apply AFA).  *Id.* § 1677e(b).

 In selecting an AFA rate, Commerce may use information from the petition, the

investigation, prior administrative reviews, or "any other information placed on the record."  *Id.*

§ 1677e(b)(1)–(4); *see Gallant Ocean (Thai.) Co. v. United States*, 602 F.3d 1319, 1323 (Fed.

Cir. 2010) ("[I]n the case of uncooperative respondents," Commerce has discretion to "select

from a list of secondary sources as a basis for its adverse inferences."); *see also* Statement of

Administrative Action Accompanying Uruguay Round Agreements Act, H.R. Doc. No. 103-316,

at 870, *reprinted* in 1994 U.S.C.C.A.N. 4040, 4199 (1994) ("SAA") ("Secondary information is

information derived from the petition that gave rise to the investigation or review, the final

determination concerning the subject merchandise, or any previous review under section 751

[(19 U.S.C. § 1675)] concerning the subject merchandise.").  In addition, "in selecting a

reasonabl[e] [AFA] rate, Commerce must balance the statutory objectives of finding an accurate

dumping margin and inducing compliance, rather than creating an overly punitive result."

*Timken Co. v. United States*, 354 F.3d 1334, 1345 (Fed. Cir. 2004).

 When Commerce relies on secondary information, "rather than on information obtained

in the course of an investigation or review," it "shall, *to the extent practicable*, corroborate that

information from independent sources that are reasonably at [its] disposal."  19 U.S.C.

§ 1677e(c) (emphasis added).  "To corroborate secondary information, Commerce must find the

information has 'probative value,' by demonstrating the rate is both reliable and relevant."  *Ad*

*Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1354 (Fed. Cir. 2015)

(quoting *KYD, Inc. v. United States*, 607 F.3d 760, 765 (Fed. Cir. 2010)) (citing *Gallant Ocean*,

602 F.3d at 1323–25); *see also F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*,

216 F.3d 1027, 1032 (Fed. Cir. 2000) ("It is clear from Congress's imposition of the

corroboration requirement in 19 U.S.C. § 1677e(c) that it intended for an adverse facts available rate to be a *reasonably accurate* estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." (emphasis added)); *Hubscher Ribbon Corp. v. United States*, 38 CIT __, __, 979 F. Supp. 2d 1360, 1365 (2014) ("In practice 'corroboration' involves confirming that secondary information has 'probative value,' by examining its 'reliability and relevance.'" (citations omitted)).  In other words, "Commerce must select secondary information that has some grounding in commercial reality." *Gallant Ocean*, 602 F.3d at 1324; *see also Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1343 (Fed. Cir. 2016) ("We clarify that 'commercial reality' and 'accurate' represent reliable guideposts for Commerce's determinations.  Those terms must be considered against what the antidumping statutory scheme demands.").

Furthermore, the information used to corroborate a rate must bear a relationship to a particular respondent in order to satisfy the relevance requirement.  *See Gallant Ocean*, 602 F.3d at 1324; *see also Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1384 (Fed. Cir. 2012) (Observing that "because nothing in the record . . . tied the AFA rate . . . to [the respondent], we concluded that the AFA rate was unrelated to commercial reality and not a reasonabl[y] accurate estimate of [the respondent's] actual dumping, hence, not supported by substantial evidence.").

## II.     THE DEPARTMENT REASONABLY DETERMINED THE 157.68 PERCENT RATE IS NOT A SUITABLE AFA RATE FOR FOSHAN SHUNDE

As noted, in *Foshan Shunde III*, the court directed Commerce to either reopen "the record and make all reasonably practicable efforts to identify independent sources reasonably at its disposal that bear on the relevance of the 157.68 percent rate to Foshan Shunde" or, if it was

unable to do so, to "explain what independent sources it considered and why those sources

contained no relevant information." *Foshan Shunde III*, 38 CIT at __, 991 F. Supp. 2d at 1334–

35.  In addition, if Commerce declined to again assign the 157.68 percent rate, the court ordered

the Department to "determine a separate rate for Foshan Shunde that is supported by substantial

evidence and in accordance with law." *Id.* at __, 991 F. Supp. 2d at 1335.

Defendant-intervenor HPI objects to Commerce's selection of the new AFA rate of 72.29

percent for Foshan Shunde, claiming this choice is unsupported by substantial evidence and not

in accordance with law.  Def.-Int.'s Cmts. 10.  According to HPI, Commerce should have

continued to use the 157.68 percent rate because that rate was corroborated to the extent

practicable.  Def.-Int.'s Cmts. 9.  Specifically, HPI maintains that the Department adhered to the

court's directives in *Foshan Shunde III* by reopening the record and "mak[ing] all reasonably

practicable efforts to identify independent sources reasonably at its disposal that b[ore] on the

relevance of the 157.68 percent rate to Foshan Shunde."  Def.-Int.'s Cmts. 5 (quoting *Foshan*

*Shunde III*, 38 CIT at __, 991 F. Supp. 2d at 1334–35) (internal quotation marks omitted).  That

is, for HPI, "[b]ased on its very own research and findings, the Department demonstrated that it

was justified in continuing to use 157.68 percent as the AFA rate for Foshan Shunde."  Def.-

Int.'s Cmts. 8.

HPI further argues that, in accordance with the court's order, Commerce described the

specific steps it took to locate independent sources, and this "provide[d] ample support for

maintaining its preferred rate of 157.68 percent."  Def.-Int.'s Cmts. 9.  Thus, HPI insists there

was no reason to change the rate because "[t]he Court [gave] the Department license to maintain

the rate of its choice—provided that certain measures were taken to ensure compliance with the

law and, based on the Department's statements, they were."  Def.-Int.'s Cmts. 8.  HPI also

questions how a rate that was determined by calculating the weighted average of the rates

assigned to the two mandatory respondents during the Investigation is more relevant to Foshan

Shunde, and more reflective of its commercial reality, than the 157.68 percent rate that was

calculated for a company that HPI alleges was related to Foshan Shunde.  Def.-Int.'s Cmts. 9.

The court finds HPI's arguments unpersuasive.  HPI is correct that, in accordance with

the court's remand order in *Foshan Shunde III*, the Department reopened the record, searched for

independent sources, and properly detailed the steps it undertook to locate information to

corroborate the 157.68 percent rate.  *See* Third Remand Results at 7 n.36 ("[T]o follow the

Court's order, we note the Department searched the internet in an attempt to find any 'primary

information' that is contemporaneous with the [POR] and could address the commercial reality

concerns identified by the Court.  We found no relevant information.  We also re-examined the

record to determine whether any additional Customs data had been overlooked.  None was.  We

also considered whether any additional Customs data might be useful, but could not identify any

additional Customs data or sources reasonably at the Department's disposal.").  Thus,

Commerce's description of the steps it took to corroborate the 157.68 percent duty rate,

including reopening the record, searching for additional primary and secondary information,

reexamining the record, and considering additional data from Customs, might have resulted in

sufficient corroboration of the 157.68 percent rate.

Nevertheless, contrary to HPI's assertions, following a fourth attempt to identify

independent sources, and given the inapplicability of the *Rhone Poulenc* presumption and the

court's rejection of Commerce's efforts to corroborate the 157.68 percent rate on three prior

occasions, the Department reasonably determined the rate was unsuitable.  *See* Third Remand

Results at 8.  Indeed, in *Foshan Shunde III*, the court gave Commerce the option of assigning to

and corroborating a new rate for Foshan Shunde, and did not limit the Department's ability to do

so based on the success of its efforts to corroborate the previously-assigned rate.  *See Foshan*

*Shunde III*, 38 CIT at __, 991 F. Supp. 2d at 1335.  In other words, the Department reasonably

determined it could not demonstrate the relevance of the 157.68 percent rate to Foshan Shunde

after three remands, and therefore looked elsewhere for an appropriate rate.

As to HPI's claim that the 157.68 percent rate better reflects Foshan Shunde's

commercial reality because it was a rate calculated for a single company, as compared to the

72.29 percent rate, which was derived from the weighted average of two different companies, the

court finds this argument unpersuasive.  The 72.29 percent rate was based on the history of two

different respondents, and therefore on a somewhat broader set of data.  Accordingly, the new

rate better addresses the court's concerns about relevance and commercial reality as compared to

the 157.68 percent rate, which was supported by, at least in part, a modified form of the *Rhone

Poulenc* presumption that the court has repeatedly held does not apply to the circumstances of

this case.  *See id.* at __, 991 F. Supp. 2d at 1330–31; *Foshan Shunde II*, 37 CIT at __ n.4, Slip

Op. 13-47, at 10 n.4.  As to HPI's argument that the 157.68 percent rate should be sustained

because it was assigned to a company affiliated with Foshan Shunde, no such finding was made

by the Department or the court in this proceeding.

Accordingly, the court finds the Department's determination to no longer use the 157.68

percent AFA rate in light of the inapplicability of the *Rhone Poulenc* presumption, its inability to

identify independent sources to corroborate the rate, and the court's authorization in *Foshan

Shunde III* to assign a new rate to the company irrespective of the success of its efforts to

corroborate the 157.68 percent rate, to be supported by substantial evidence and in accordance

with law.

III.  **THE DEPARTMENT'S SELECTION OF THE 72.29 PERCENT AFA RATE IS SUPPORTED BY SUBSTANTIAL EVIDENCE**

Next, Foshan Shunde argues the Third Remand Results are unlawful because "Commerce . . . failed to meet its burden of identifying independent sources" to corroborate the 72.29 percent rate.  Pl.'s Cmts. 7.  Plaintiff contends "Commerce merely 'searched the internet in an attempt to find additional primary information contemporaneous with the POR which could address the commercial reality concerns identified by the Court,'" but this was insufficient to meet the Department's corroboration obligations.  *See* Pl.'s Cmts. 8 (quoting Third Remand Results at 13).  For instance, Foshan Shunde asserts "Commerce does not detail the extent of this 'search,' and the explanation is cursory at best."  Pl.'s Cmts. 8.  Instead, plaintiff claims, rather than "expend[ ] serious effort to comply with the [Third Remand Results] and locate reliable independent sources, Commerce complain[ed] that there [was] no primary information from Foshan Shunde to corroborate, because Commerce previously rejected the data provided by Foshan Shunde."  Pl.'s Cmts. 8.

Foshan Shunde also claims Commerce failed to satisfy the court's relevance and commercial reality concerns expressed in *Foshan Shunde III*.  Plaintiff argues that, because the 72.29 percent rate is based on rates calculated for two other companies, and not for Foshan Shunde itself, it does not reflect the company's commercial reality.  *See* Pl.'s Cmts. 9–10.  Further, plaintiff contends that "if the current commercial reality . . . during the review period was a 72.29 percent rate and that [was] a true rate for all Chinese companies, Customs data would show substantial imports into the United States with a cash deposit rate of 72.29 percent rate paid on imports or something close to it."  Pl.'s Cmts. 10.  Plaintiff claims there is no such data because Foshan Shunde's actual commercial reality during the POR reflected a rate of 2.37

percent, the rate it was originally assigned during the first administrative review, as well as its

cash deposit rate in effect during this POR.  Pl.'s Cmts. 10–11.

Relatedly, plaintiff insists the 72.29 percent rate was not properly corroborated because

the Department failed to "look at [Foshan Shunde's] cash deposit rate upon entering the ironing

tables into the U.S. market, which was 2.37 percent," or other rates on the record, ranging from 0

to 10.18 percent, and then "add 'some built in increase intended as a deterrent to non-

compliance.'"  Pl.'s Cmts. 12–13 (quoting *De Cecco*, 216 F.3d at 1032).  Finally, Foshan Shunde

maintains that the 72.29 percent rate is "not an amount that would allow any importer to stay in

business in the United States."  Pl.'s Cmts. 11.

The court finds Foshan Shunde's arguments unpersuasive, and holds that Commerce's

assignment of the 72.29 percent AFA rate is supported by substantial evidence and in accordance

with law.

First, as noted, Commerce properly concluded that the 157.68 percent rate, which was the

highest calculated rate for a cooperating company in the history of the Order, was "unsuitable for

use as the [AFA] rate" for Foshan Shunde based on the Department's unsuccessful efforts to

locate independent sources to corroborate the rate combined with the inapplicability of the *Rhone*

*Poulenc* presumption.  *See* Third Remand Results at 9.  The Department then looked to other

rates assigned over the course of the proceedings to potentially use as AFA, but reasonably

concluded these rates were unsuitable.[7]  *See id.*  Specifically, Commerce found these rates: (1)

---

[7]        In particular, the Department determined the following rates were unsuitable for
use as AFA for Foshan Shunde:

1.  9.47 percent rate assigned to Since Hardware during the October 1, 2002 through
    March 31, 2003 investigation period
2.  157.68 percent rate assigned to Shunde Yongjian Housewares during the October 1,
    2002 through March 31, 2003 investigation period

(footnote continued)

were "calculated for companies other than Foshan Shunde"; (2) were "from the [underlying]

investigation or otherwise pre-date[d] the [POR] and, thus, given the analysis set forth in *Foshan*

*Shunde II* and *Foshan Shunde III*, . . . not specifically 'relevant' to Foshan Shunde"; or (3) were

"too low to induce cooperation in future reviews of this proceeding and [were] therefore

unsuitable for use as an AFA rate." *Id.* at 9; *see Mueller Comercial de Mexico, S. de R.L. de*

*C.V. v. United States*, 753 F.3d 1227, 1235 (Fed. Cir. 2014) (describing the AFA statute as "'the

means Congress intended for Commerce to use to induce cooperation with its antidumping

investigations.'" (quoting *KYD*, 607 F.3d at 768)).

        As to the corroboration of the 72.29 percent rate selected by Commerce, as noted, when

Commerce "relies on secondary information rather than on information obtained in the course of

an investigation or review, . . . [it] shall, *to the extent practicable*, corroborate that information

from independent sources that are *reasonably at its disposal*." *See* 19 U.S.C. § 1677e(c)

(emphases added).  In other words, as the court confirmed in *Foshan Shunde II* and *Foshan*

*Shunde III*, Commerce is not required "to go to extraordinary lengths to corroborate secondary

information where the record is deficient." *See Foshan Shunde III*, 38 CIT at __, 991 F. Supp.

2d at 1334 (citing *PSC VSMPO-AVISMA Corp. v. United States*, 35 CIT __, __, Slip Op. 11-115,

---

3.  2.37 percent rate assigned to Foshan Shunde during the February 3, 2004 through
    July 31, 2005 review period
4.  10.18 percent rate assigned to Forever Holdings, Limited during the February 3, 2004
    through July 31, 2005 review period
5.  0.45 percent rate assigned to Since Hardware during the February 3, 2004 through
    July 31, 2005 review period
6.  0.34 percent rate assigned to Since Hardware during the August 1, 2005 through July
    31, 2006 review period
7.  157.68 percent rate assigned to Since Hardware during the August 1, 2006 through
    July 31, 2007 review period
8.  0.00 percent rate assigned to Forever Holdings, Limited during the August 1, 2006
    through July 31, 2007 review period

Third Remand Results at 9.

at 5 (Sept. 15, 2011); *Hubscher Ribbon*, 38 CIT at __, 979 F. Supp. 2d at 1368–70; *Nan Ya*

*Plastics Corp. v. United States*, 37 CIT at __, 906 F. Supp. 2d 1348, 1351–53 (2013); *Tianjin*

*Mach. Imp. & Exp. Corp. v. United States*, 36 CIT __, __, Slip Op. 12-83, at 10–13 (June 14,

2012)).

Here, despite Commerce's difficulty in locating independent sources to corroborate the

remaining duty rates assigned over the course of the proceedings under the Order, it is evident

that the Department has corroborated the 72.29 percent rate "to the extent practicable."  *See* 19

U.S.C. § 1677e(c).  As the Department correctly observed, unlike the 157.68 percent rate that

was repeatedly rejected by the court, in part because it was calculated for a single company

during a prior review, this deficiency is less pronounced with the 72.29 percent rate.  Rather, the

72.29 percent rate is derived from two calculated rates (i.e., the weighted average of the 157.68

percent rate assigned to Yongjian and the 9.47 percent rate assigned to Since Hardware during

the Investigation), and was also the rate "in effect for all companies which have demonstrated

they are separate from the PRC-wide entity."  *See* Third Remand Results at 10.  In other words,

the 72.29 percent rate was the rate in effect for cooperating companies that had demonstrated

entitlement to a separate rate.  This rate is therefore reflective of Foshan Shunde's commercial

reality because similar exporters of subject merchandise were able to, and actually did, import

subject merchandise into the United States at this rate.

Furthermore, assigning an AFA rate to an uncooperative party that is lower than the

separate rate assigned to cooperative respondents runs contrary to the purpose of the AFA

statute—to incentivize future compliance on the part of uncooperative respondents.  *De Cecco*,

216 F.3d at 1032.  That is, were the Department to assign Foshan Shunde an AFA rate of less

than 72.29 percent, Foshan Shunde would have obtained a lower rate than those parties that

cooperated fully with Commerce, and thus would have no incentive to cooperate in future

reviews.  *See* SAA, H.R. Doc. No. 103-316, at 870, *reprinted in* 1994 U.S.C.C.A.N. at 4199 ("In

employing adverse inferences, one factor the agencies will consider is the extent to which a party

may benefit from its own lack of cooperation.").  Therefore, in addition to being relevant to

Foshan Shunde, the rate of 72.29 percent fulfills the goal of the AFA statute—"to encourage

future cooperation by 'ensur[ing] that the party does not obtain a more favorable result by failing

to cooperate than if it had cooperated fully.'"  *See Fine Furniture (Shanghai) Ltd. v. United

States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014) (alteration in original) (quoting SAA, H.R. Doc.

No. 103-316, at 870, *reprinted in* 1994 U.S.C.C.A.N. at 4239).  In addition, the Department

reasonably determined that, due to Foshan Shunde's withholding of accurate factors of

production and U.S. sales information, it was impossible to determine accurately Foshan

Shunde's commercial reality during the POR.  *See* Third Remand Results at 7–8.  Thus, Foshan

Shunde's arguments regarding relevance and commercial reality are unpersuasive.

Second, Foshan Shunde's argument that its 2.37 percent cash deposit rate is

representative of its commercial reality during the POR is meritless.  As an initial matter, in

*Foshan Shunde II*, the court expressly rejected the use of the 2.37 percent rate as the dumping

rate for Foshan Shunde in this review.  *See Foshan Shunde II*, 37 CIT at __, Slip Op. 13-47, at 6–

7 ("Thus, according to plaintiffs, Commerce was required to use the 2.37 [percent] rate

calculated for Foshan Shunde in the first administrative review or to create a rate using some

unspecified methodology.  This argument cannot be credited.  On remand, the court expressly

instructed Commerce to 'take[] into consideration the Department's determination, sustained

here, to apply AFA to Foshan Shunde's factors of production and sales data.'  Therefore, the

court anticipated the use of a reasonable AFA methodology by Commerce when determining the

company's rate.  Nothing in the order indicated that when applying AFA, the Department was

required to calculate a rate for Foshan Shunde or that it was prohibited from using any

reasonable method for determining the company's rate." (alteration in original) (quoting *Foshan Shunde I*, 36 CIT at ___, Slip Op. 11-123, at 42)).

Furthermore, after an investigation results in the issuance of an antidumping duty order, Commerce directs Customs to collect *estimated* antidumping duties (i.e., cash deposits) on entries of merchandise subject to the order.  *See* 19 U.S.C. § 1673b(d)(1)(B).  These deposit rates, however, are only estimates of the eventual liability to which importers might be subject for entries of merchandise that are covered by an antidumping duty order.  As frequently noted by this Court, the antidumping duty regime is retrospective in nature, and interested parties may request annual reviews to better approximate their duty rates for a period of time that has already ended.  *See* 19 U.S.C. § 1675; 19 C.F.R. § 351.213.  Hence, in the event a review results in a rate that differs from the cash deposit rate, an importer's liability may require an adjustment.  Here, the 2.37 percent cash deposit rate for the current review was assigned to Foshan Shunde during the first administrative review.  The purpose of the fourth review is to determine whether the rate of 2.37 percent remains an accurate duty rate for Foshan Shunde during the current POR, and says nothing about the company's commercial reality during this POR.

Similarly, the court finds unavailing Foshan Shunde's argument that one of the record rates ranging from 0 to 10.18 percent should have been used, along with a built-in increase for Foshan Shunde's non-compliance.  It is unclear what level of built-in increase to these rates plaintiff believes would be appropriate and, in any case, it is "Commerce's task . . . to identify the amount necessary to deter noncompliance."  *Lifestyle Enter., Inc. v. United States*, 36 CIT ___, ___, 865 F. Supp. 2d 1284, 1291 (2012).  Here, Commerce balanced the statutory directives to select an AFA rate that (1) would induce future cooperation on the part of Foshan Shunde, and (2) was reflective of Foshan Shunde's commercial reality during the POR in a case where the

company filed deficient information regarding its factors of production and sales during the

POR.

Because the 72.29 percent rate assigned to Foshan Shunde satisfies Commerce's

inducement criteria by ensuring that the company does not obtain a more favorable outcome than

it would have received had it cooperated with the Department's requests for information, and

Commerce corroborated the rate to the extent practicable in accordance with the statute, the court

holds the Department's assignment of the rate is supported by substantial evidence and is in

accordance with law.  Accordingly, Commerce's Third Remand Results are sustained.


**CONCLUSION**

For the foregoing reasons, it is hereby

ORDERED that the Department of Commerce's Third Final Results of Redetermination

Pursuant to Court Remand are sustained.  Judgment will be entered accordingly.


Dated:          April 7, 2016
                New York, New York

                                                                    /s/ Richard K. Eaton
                                                        _____
                                                                    Richard K. Eaton